Argued and submitted November 4, 2004, judgment for attorney fees vacated and remanded; otherwise affirmed August 10, 2005

Naomi D'ABBRACCI,
Randal Cranor, Russell Hanson,
Ernest Bieri, Louelle Bieri,
Donald Young, and Mountain Energy, Inc.,
*Appellants,*

*v.*

Anita SHAW-BASTIAN,
*Respondent.*

00-CV-0453; A119830

117 P3d 1032

Joseph E. Kellerman argued the cause for appellants. With him on the briefs were Richard Billin and Hornecker, Cowling, Hassen & Heysell, L.L.P.

Christopher L. Cauble argued the cause for respondent. With him on the brief was Cauble & Dole.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Armstrong, Judge.

BREWER, C. J.

---

* Brewer, C. J., *vice* Leeson, J. pro tempore.

**BREWER, C. J.**

In this action to enforce easement rights, plaintiffs assign error to the trial court's dismissal, after a trial to the court, of their claims for interference with roadway and pipeline easements, its award of attorney fees to defendant, and its failure to award attorney fees to plaintiffs. Plaintiffs argue that defendant interfered with their easement rights by relocating an easement road that crosses defendant's property; placing encroachments on the easement; constructing a new road that is unstable and unsafe; and, in the construction process, adding fill over a pipeline, thereby making access to the pipeline more difficult. We affirm with respect to plaintiffs' easement claims and their request for attorney fees. However, we remand for further proceedings with respect to the determination of the amount of defendant's attorney fees.

Except where noted, the following facts are not in dispute. All of the parties, except plaintiff Mountain Energy, Inc. (Mountain Energy), own and reside on parcels of land on a hill to the east of the Oregon Caves Highway near Cave Junction. Each of the parcels is accessible only by a gravel road built on a roadway easement that crosses several of the parcels, including defendant's. Plaintiffs D'Abbracci, Cranor, and Hanson own and reside on properties to the north of and uphill from defendant's property. Plaintiffs Young and the Bieris own and reside on properties to the west of and downhill from defendant's property. Young's property abuts the Oregon Caves Highway. The roadway easement was created by the parties' predecessors in interest in 1979. It is described by metes and bounds in an instrument entitled, "AGREEMENT TO ESTABLISH ROADWAY EASEMENT." The easement is 60 feet wide and benefits each of the parcels owned by the parties. Around 1980, Cranor moved onto the parcel now owned by Hanson. He and the other property owners constructed a 12-foot-wide road on the easement. Utility lines that serve each of the parcels were later buried along the edge of the road.

Plaintiff Mountain Energy previously owned the parcels that defendant and Young now own. In 1982, Mountain Energy built a hydroelectric facility that includes a powerhouse on what is now Young's property and a small dam near the northern boundary of what is now defendant's

property. The dam and the powerhouse are connected by a pipeline that is buried three to four feet beneath the surface and carries the water that drives the hydroelectric generator. Although Mountain Energy no longer owns the underlying properties, it continues to operate the facility. From October to June each year, the facility generates power, which Mountain Energy sells to an electric utility.

In 1991, defendant purchased her property from Mountain Energy. At the time of the sale, Mountain Energy's sole shareholder, Goldwasser, told defendant about the pipeline and the hydroelectric operation, but he did not specifically refer to an easement for the pipeline. The deed to the property also did not include the reservation of an express pipeline easement.

At the location where the road crosses the northern boundary of defendant's property from the north, the road runs in a south-southeasterly direction and then curves toward the southwest. Just before the curve, the road crosses over the pipeline, which, from the dam, also runs toward the southwest. Where the road begins to run to the southwest after the curve, the pipeline is located approximately 45 feet from the western edge of the road. The road and the pipeline both run toward the southeast corner of the Bieris' property. As the road was originally constructed, the road and pipeline were located at least several feet apart. At the corner, both the road and the pipeline turn to the west. However, the road curves gradually, whereas the pipeline turns fairly sharply; as a result, heading west from the corner, their paths diverge again for some distance. The pertinent courses and locations of the easement, road, and pipeline are depicted on the map below.

The dispute in this case centers around an approximately 500-foot section of the road from the curve near the northern boundary of defendant's property to a location near the southeast corner of the Bieris' property. Where that section of the road was originally built, there was a steep embankment above it on the eastern side and a gradual downhill slope below it on the western side. The road was built on existing soil by excavation into the hillside, so that the downhill side of the road was not built up with fill material. As a result, the western edge of the road was level with the existing grade, making it possible to drive off the one-lane road onto the unimproved shoulder.

In 1999, defendant applied for permits from Josephine County to build a fish farm on her property. Defendant proposed to build fish ponds above the steep embankment on the eastern side of the road. As a condition to issuing the permits, the county required defendant to implement erosion control measures. Defendant hired The Galli Group, an engineering firm, to develop an erosion control plan. The firm suggested that she relocate the road to the west by at least 20 feet and cover the existing road with fill material to create a more gradual embankment between the road and the ponds.

In the fall of 1999, Mountain Energy discovered that a section of its pipeline on defendant's property had failed, rendering the hydroelectric facility inoperable until the pipeline could be repaired. Meanwhile, plaintiffs became aware of defendant's proposed project and objected to any alteration of the existing road. At a meeting with defendant, Goldwasser informed defendant about the broken pipeline and told her that Mountain Energy was attempting to repair it. Defendant told Goldwasser, "You'd better get it done." Despite plaintiffs' objections, in September 2000, defendant began construction to implement The Galli Group's erosion control plan. Mountain Energy had not yet repaired the broken pipeline.

Defendant built up the grade on the downhill side of the old road with fill material to create level ground on which she then constructed a new gravel road. The new road lies in the westernmost 15 feet of the 60-foot easement, approximately 28 feet to the west of the old road. Instead of a gradual

shoulder on the downhill side of the new road, there is now a steep embankment that drops by as much as 12 feet. In addition to relocating the road, defendant placed a retaining pond, culverts, and vegetation on the easement but outside the relocated roadway.

A portion of Mountain Energy's pipeline was buried under the fill used to level the grade for the new road. According to a survey map that plaintiffs introduced into evidence, approximately 100 feet of the pipeline lies directly below the western edge of the road. At either end of that 100-foot section, an additional length of pipeline is covered by the new embankment along the road. By various measurements and estimates, the affected portion of the pipeline is now between 6 and 16 feet below the surface. A portion of the utility lines is also buried under the added fill material.

As a result of defendant's activities, plaintiffs brought this action. D'Abbracci, Cranor, Hanson, Young, and the Bieris asserted claims for private nuisance, interference with the roadway easement, and interference with a utility easement. In each claim, plaintiffs requested an injunction requiring defendant to restore the roadway to its original condition and location and, alternatively, damages in the amount of $75,000, the estimated cost of restoring the easements. In their interference with easement claims, they also requested attorney fees. Mountain Energy asserted four additional claims, including three alternative claims alleging that it had a prescriptive easement, an irrevocable license, or an easement by implication allowing it to operate, access, and maintain its pipeline. The fourth claim alleged that defendant's activities had substantially interfered with Mountain Energy's rights associated with the pipeline. Mountain Energy alleged that the added fill over the pipeline made it infeasible to repair the broken section and that, as a result, it had lost $20,000 in power sales and was likely to lose more. Mountain Energy sought damages for lost profits and an injunction requiring defendant to restore the road to its original location and to remove all encroachments on the pipeline easement.

In her answer to the complaint, defendant denied plaintiffs' claims and asserted a counterclaim for breach of

the roadway easement agreement, arguing that she had improved the road and that plaintiffs were obligated to contribute to the costs that she incurred in doing so. Defendant also requested attorney fees and costs.

The case was tried to the court in May 2002. With respect to their claim for interference with the roadway easement, plaintiffs argued that defendant could not unilaterally relocate the road nor place a permanent encroachment on any part of the easement. They also argued that the manner in which defendant had constructed the new road made it unstable and unsafe in icy conditions. Plaintiffs adduced evidence that the road is built on soil and other organic material, rather than rock. Their evidence showed that cracks had begun to form along the edge of the road, which, they asserted, indicated that the road had already begun to fail; they expressed concern that it would wash out and become impassable. Plaintiffs also expressed concerns about sliding off the downhill side of the road when it is icy. When asked about actual interference with access to their respective properties, several of the plaintiffs testified that, while the new road was under construction, their passage was delayed by as much as 20 minutes because construction equipment blocked the road. However, with one exception, they stated that, after construction was finished, defendant had not interfered with their use of the road. Only Cranor mentioned later problems; he stated that defendant "parks her truck in the middle of the road so she can get out and take pictures [instead of using] one of the turnouts that she created."[1]

Plaintiffs also adduced evidence in support of Mountain Energy's claims that it had a pipeline easement and that defendant's activities interfered with the company's access to the pipeline. Goldwasser testified that defendant had placed up to 12 feet of additional soil over a 545-foot section of the pipeline and that, as a result, it would cost $50,000 or more to excavate and backfill that section. He also stated that, because the pipeline was broken, he had been unable

---

[1] Plaintiffs adduced other evidence in support of their claims for interference with the utility easement and for nuisance. However, the factual details are unimportant here because the trial court rejected those claims, and plaintiffs do not challenge those rulings on appeal. The claims are pertinent here only as they relate to the attorney fees issue.

to generate power for three years and had lost between $30,000 and $40,000 in power sales. On cross-examination, Goldwasser conceded that he had discovered that the pipeline was broken nearly a year before defendant began construction on the road. He stated that the company had not repaired the pipeline during that time because it could not afford the repairs. He stated further that he had eventually secured a loan for $13,000 but that defendant had moved the road before he could "finish the job." On further questioning, Goldwasser acknowledged that Mountain Energy had "spent a few thousand dollars on materials" but had used the balance of the loan proceeds on other projects.

Defendant elicited testimony from William Galli, an engineer and the president of The Galli Group. Galli testified that the new road was well built and that, compared to the old one, "it was a nicer road or better, easily." Galli also testified that only 180 to 190 feet of Mountain Energy's pipeline was covered by the added fill material and that the fill added an average of only six feet to the depth that would have to be excavated to reach the pipeline. He estimated that excavation of the entire section covered by the added fill would cost no more than $3,500.

The trial court concluded that Mountain Energy held an easement by implication for the pipeline, including access rights for maintenance and repair. However, the court rejected plaintiffs' other claims, concluding that plaintiffs had failed to prove that defendant had substantially interfered with their easement rights. Specifically, the court found that the roadway easement had been used only for ingress and egress and that defendant had not materially interfered with plaintiffs' access to their respective properties. The court found "no persuasive evidence that defendant did anything but recreate a stable and good road." It also concluded that plaintiffs had not proved that defendant had substantially interfered with Mountain Energy's access to its pipeline. The court found Goldwasser's calculations to be so imprecise and speculative that the witness lacked credibility as to the amount and cost of excavation required to repair the pipeline. With respect to Mountain Energy's lost profit claim, the court concluded that the company had failed to mitigate its damages by failing to timely repair the pipeline. The court

also rejected defendant's counterclaim, concluding that the road work that defendant had done primarily benefitted her own property and was well beyond what was required simply to maintain the easement. Finally, the court held that, under the easement agreement, defendant was entitled to recover attorney fees from plaintiffs D'Abbracci, Cranor, Hanson, Young, and the Bieris.[2]

In their first assignment of error, plaintiffs challenge the trial court's conclusion that defendant did not substantially interfere with the roadway easement. In support of their assignment, plaintiffs make four arguments. First, they argue that, when an easement is described by metes and bounds, the dominant estate holder has the right to use the entire easement and that, even if no such use is contemplated, any permanent encroachment on the unused portion of the easement interferes with that right. They assert that defendant effectively eliminated 45 feet from the easement by extending the embankment on the eastern side of the road and by placing culverts, retaining ponds, and vegetation on the easement. Second, plaintiffs contend that, as a servient owner in the context of this case defendant was not authorized to relocate the easement without plaintiffs' consent and that, by doing so, defendant inherently interfered with their easement rights. Third, plaintiffs argue that defendant substantially interfered with their easement rights by building a road that lacks "refuge necessary for snowy and icy conditions."[3] Finally, they contend that the new road is not structurally sound. In plaintiffs' view, they are entitled to injunctive relief requiring defendant to restore the road to its original location and condition.

---

[2] The easement agreement provided that, in any action to enforce or construe the agreement, the prevailing party is entitled to recover his or her attorney fees. Plaintiffs' claim for interference with the roadway easement and defendant's counterclaim were both based on the easement agreement. None of the other claims in the case involved the right to attorney fees. We set out additional facts relevant to the attorney fee award in our discussion of plaintiffs' third assignment of error.

[3] Plaintiffs also argue that the new road lacks turnouts that would allow drivers to avoid oncoming traffic easily. Nothing in the evidentiary record indicates that there are no turnouts on the new road or that plaintiffs have been inconvenienced by traffic. To the contrary, in his testimony, Cranor referred to "the turnouts that [defendant] created." We reject that argument without further discussion.

Defendant responds that, in determining whether a servient owner has substantially interfered with an easement, courts consider whether the challenged activities affect the particular use for which the easement was granted. Defendant argues that a dominant estate holder's right to use the entire easement is limited to what is necessary for the fair enjoyment of the easement and that the servient owner otherwise retains full dominion over the burdened land. Thus, defendant contends, her relocation of the road and placement of the embankment and other encroachments on the easement do not constitute substantial interference because they do not interfere with plaintiffs' access to their respective properties.

■■ As a threshold matter, we address the appropriate standard of our review in this case. Whether a servient owner's use of property subject to an easement constitutes substantial interference is a question of fact. *Landauer v. Steelman*, 275 Or 135, 141, 549 P2d 1256 (1976). Plaintiffs argue that their claims are equitable in nature and that we therefore review the record *de novo*. Defendant counters that, because plaintiffs sought damages, the claims are legal in nature, and we are therefore bound by the trial court's findings if there is any evidence in the record to support them. As noted, in their interference with easement claims, D'Abbracci, Cranor, Hanson, Young, and the Bieris sought injunctive relief and, alternatively, monetary damages. Mountain Energy also sought injunctive relief in connection with its interference claim as well as damages for repair of its pipelines and lost profits.

■ "The nature of the relief sought generally determines whether a claim is an action at law or a suit in equity." *Assn. of Unit Owners v. Far West Federal Bank*, 120 Or App 125, 134, 852 P2d 218 (1993). Plaintiffs primarily sought injunctive relief on their claims for interference with easement rights. Because their requests for damages on those claims were either alternative or ancillary to their requests for injunctive relief, our standard of review is *de novo*. *See Franklin v. Stern*, 122 Or App 306, 308, 858 P2d 142, *adh'd to as modified on recons*, 124 Or App 275, 862 P2d 508 (1993), *rev den*, 318 Or 326 (1994) (applying *de novo* review standard to equitable claim on which the plaintiff alternatively sought

damages); *see also Ford v. Grimes*, 109 Or App 692, 693 n 1, 820 P2d 904 (1991) (where monetary relief is ancillary to equitable relief, review is *de novo*); *Allen v. Meinig*, 109 Or App 341, 344, 819 P2d 744 (1991), *rev den*, 313 Or 209 (1992) (same). Accordingly, we find anew the facts necessary to our determination.

■■ We begin with plaintiffs' argument that, when an easement is described by metes and bounds, the easement holder has an absolute right to use the entire easement. We disagree. It is well established that

> "an easement holder can make only such use of an easement as is reasonably necessary to accomplish the purpose for which the easement is granted[,] and the remaining dominion over the land upon which the easement lies continues with the servient landowner. The reasonable necessity of a proposed use of an easement is a fact-based inquiry and must be determined from the circumstances of each case."

*Clark v. Kuhn*, 171 Or App 29, 33, 15 P3d 37 (2000) (citations omitted). Even when an easement is described by metes and bounds, "the physical location of the easement does not define the uses of the property by the servient and dominant estate owners." *Id.* at 34.

In *Clark*, the defendant held an "easement for right-of-way purposes over a strip of land 25.0 feet in width" that was described in metes and bounds. *Id.* at 31. The existing one-lane, gravel road did not occupy the full width of the easement. The defendant sought to widen the road to two lanes and pave it. The proposed improvements would have required removing obstructions from the easement, including trees, large rocks, and a dirt berm that the servient owner had placed there. *Id.* We noted that "the stated scope of the grant of the easement acknowledges the right of [the servient owner] to make use of the 25-foot strip so long as that use does not interfere with defendant's right of way to his property." *Id.* at 35. We held that some changes were "reasonably necessary to allow safe passage for vehicles" but that using the entire 25-foot easement for a paved, two-lane road was not "*essential* to [the] defendant's ingress and egress to his property." *Id.* at 34-35 (emphasis in original). As a result, we

concluded that the defendant had to leave most of the obstructions in place. *Id.* at 35.

Plaintiffs argue that our conclusion in *Clark* is inconsistent with our decision in *Tooker v. Feinstein*, 131 Or App 684, 886 P2d 1051 (1994), *adh'd to as modified on recons*, 133 Or App 107, 889 P2d 1356, *rev den*, 321 Or 94 (1995). In that case, the defendants held a metes and bounds easement across the plaintiff's property. The easement varied between 50 and 95 feet in width. Before the defendants had begun building a house on their property, a 20-foot-wide asphalt road had been constructed within the easement. To support a driveway on their property, the defendants built a 37-foot-long retaining wall; part of the wall was located on the easement and part was on the plaintiff's unburdened property. The trial court ordered the defendants to remove the portion of the wall that was not within the easement. *Id.* at 686-87.

On appeal, the plaintiff asserted that the entire wall should have been removed, arguing that it was outside the scope of the "real" boundaries of the easement, which, in his view, had been established by the construction and use of the asphalt road. The defendants argued that "the scope of the easement is determined by its metes and bounds description in the deed and subdivision plat." *Id.* at 688. We agreed with the defendants, stating that, "where the language of the instrument granting the easement is clear, that language, and only that language, decides the easement's limits." *Id.*

According to plaintiffs, *Tooker* stands for the proposition that the holder of an easement the boundaries of which are defined by metes and bounds has the right to use the entire easement and, more importantly, to preclude the servient estate owner from placing permanent encroachments on any part of it. However, plaintiffs read the above-quoted passages out of context. This court did not hold in *Tooker* that a metes and bounds description in an easement instrument overrides the principles that an "easement owner is limited to those uses of the easement that are reasonably necessary for the easement's intended purpose" and that the "owner of the servient estate also has a right to make reasonable use of his or her land." *Id.* at 687. In fact, in determining whether the

trial court had erred in failing to order removal of the entire wall, we considered whether the portion of the wall within the easement was reasonably necessary to the defendants' use of the easement for a driveway. *Id.* at 688.

■ ■ Thus, *Tooker* and *Clark* are consistent. Read together, they demonstrate that the holder of an easement described by metes and bounds has the right to use the entire easement to the extent that is reasonably necessary to accomplish the purpose of the easement. In turn, the intended purpose of the easement defines how much of the easement the dominant estate holder may use.

In this case, the purpose of the easement was to establish a roadway to provide access to the various benefitted parcels. Therefore, plaintiffs' right to use the easement is limited to what is reasonably necessary to accomplish that purpose. Plaintiffs do not contend that they need to use the entire 60-foot easement for roadway purposes or that they might in the future.[4] Nor do plaintiffs contend that the encroachments on the easement interfere with their ingress and egress. To the extent that the burdened land is not needed for the road, defendant retains the right to control and use it. Defendant's dominion over the land includes the right to place encroachments on the unused part of the easement. *Cf. Clark*, 171 Or App at 31-35 (dirt berm placed on the easement by the servient owner allowed to remain in place). It follows that the trial court did not err in concluding that, by extending the eastern embankment and placing a retaining pond, culverts, and vegetation on the easement, defendant

---

[4] Although plaintiffs do not rely on the case in support of their argument, we note that, in *Tauscher v. Andruss,* 240 Or 304, 308, 401 P2d 40 (1965), the Supreme Court held that

"[a]n easement owner has the right not only to be free from interference with his actual use, but also his possible prospective uses. * * * It is not necessary for the easement owner to show that he has plans for certain uses in the future which would be interfered with by a defendant's conduct if that future use were made; it is enough if the easement owner proves that there has been an encroachment."

The court relied on the *Restatement of Property* to illustrate that principle. *See* 5 *Restatement of Property* § 510 illustration 3 (1944). However, in both *Tauscher* and the *Restatement* illustration, a third party was responsible for the encroachment, not the servient estate owner. Thus, the rights of the servient owner were not part of the equation.

did not substantially interfere with plaintiffs' access to their respective properties.

We turn next to plaintiffs' argument that defendant substantially interfered with their easement rights by relocating the road without their consent. In support of that argument, plaintiffs rely on decisions from courts in other jurisdictions because, they assert, Oregon courts have not squarely addressed the issue. We do not find it necessary to rely on decisions from other jurisdictions. Although neither we nor the Supreme Court has considered the precise question before us, existing Oregon case law is nonetheless sufficiently instructive.[5] As our discussion above demonstrates, three overarching principles apply to expressly created easement rights in Oregon: (1) the terms of the granting instrument, if unambiguous, define the location and the intended purpose of the easement; (2) the dominant estate holder's right to use the easement is limited to what is reasonably necessary to accomplish the intended purpose of the easement; and (3) the servient estate holder retains the right to use the burdened property in ways that do not unreasonably interfere with the dominant estate holder's reasonably necessary use of the property.

From those principles, it follows that a servient estate owner's right to relocate a road is subordinate to the terms of the granting instrument—namely, the location of the easement and the dominant estate holder's right to use the easement for its intended purpose. So, for example, where the boundaries of the actual road and the boundaries of the easement coincide, the servient owner may not move the road without the consent of the dominant estate holder. But where, as here, the road does not occupy the entire easement, the servient owner may unilaterally relocate the road within the boundaries of the easement if the change does not

---

[5] In any event, the cases on which plaintiffs rely do not address whether relocating a road within the boundaries of an easement, without more, constitutes substantial interference. See *Davis v. Bruk*, 411 A2d 660, 664-65 (Me 1980) (servient owner sought to relocate easement); *Hood v. Neil*, 502 So 2d 749, 750 (Ala 1987) (servient owner lowered grade of easement by five feet, cutting off the plaintiff's access to her driveway); *Fields v. Nichols*, 482 So 2d 410, 414 (Fla Dist Ct App 1985) (servient owner extended road beyond easement boundaries identified in deed); *Frost v. Robinson*, 76 NC App 399, 400, 333 SE2d 319, 320 (1985) (relocation not at issue).

unreasonably interfere with the dominant estate holder's reasonably necessary use of the easement. *Cf. Ericsson v. Braukman*, 111 Or App 57, 62-63, 824 P2d 1174 (1992) (servient owner may place gate across easement if doing so is necessary to the servient owner's reasonable use of the property). As the Supreme Court held in *Jones et ux v. Edwards et ux*, 219 Or 429, 434, 347 P2d 846 (1959), the servient owner

> " 'is privileged to make such uses of the servient tenement as are not inconsistent with the provisions of the creating instrument,' and in the application of this principle the servient owner's use of [the burdened] land 'may vary as the respective needs of himself and the owner of the easement vary.' "

(Quoting 5 *Restatement of Property* § 486 (1944).)

In short, in this case, defendant was entitled to relocate the road within the boundaries of the easement unless the change substantially interfered with plaintiffs' use of the road for ingress and egress. Plaintiffs contend that it was reasonably necessary that the road remain precisely where it was originally built, because only that location provided a safe and stable surface. Again, we disagree. There was no evidence that a safe and stable road could not be constructed elsewhere within the boundaries of the easement. Because plaintiffs suggest no other reason that it was reasonably necessary for the road to remain in its original location, we conclude that defendant retained a conditional right to relocate it within the easement boundaries.

■ We next consider whether the manner in which defendant constructed the new road substantially interfered with plaintiffs' use of the easement. Plaintiffs contend that the new road is inadequate because it could wash away and become impassable and driving on it in icy conditions may not be safe. As to the stability of the road, we conclude that plaintiffs failed to show that the road is inadequate. Although there is evidence that the road is susceptible to erosion, the record does not establish that it probably will fail. *Cf. Ericsson*, 111 Or App at 64 (use of access easement by servient estate owners for agricultural equipment and semi-tractor trucks that allegedly caused erosion, changes in grade

of road, mud holes, and damage to drainage ditches, and which required easement holders to drive on muddy portions of road, was not unreasonable interference with easement holders' right of ingress and egress because actions of servient estate owners did not make road impassable).

Plaintiffs' evidence with respect to the safety of the new road is also speculative. D'Abbracci, Cranor, and Hanson each testified that the road becomes icy in the winter, and they expressed concerns about sliding off the western edge of the road. D'Abbracci and Cranor both stated that, on the old road, if a vehicle lost traction, it could slide onto the shoulder and harmlessly come to a stop. However, neither stated that he or she had ever actually slid off the road. Hanson stated affirmatively that he had never had any problems slipping off the road. Because there is no persuasive evidence that any vehicle has slipped off the road—or that a substantial risk of such an event exists on the new road—there is no basis to find that the steeper edge presents a greater hazard.

In short, we find that the manner in which defendant built the new road does not substantially interfere with plaintiffs' rights under the easement. The trial court did not err in rejecting plaintiffs' claim for interference with the roadway easement.

In their second assignment of error, plaintiffs contend that the trial court erred in determining that defendant did not substantially interfere with Mountain Energy's implied pipeline easement. Plaintiffs argue that, by relocating the road over the pipeline, defendant substantially interfered with Mountain Energy's right of access to the pipeline. Plaintiffs also argue that the trial court erred in concluding that Mountain Energy failed to mitigate its damages because it did not repair the pipeline before defendant moved the road.

Defendant responds that placing added fill over underground pipes does not necessarily constitute substantial interference. She adds that the trial court correctly found that the amount of fill that she placed over Mountain

Energy's pipeline was not so great as to substantially interfere with its ability to obtain access to the pipeline. Defendant also disputes plaintiffs' arguments concerning mitigation.[6]

 We agree with defendant that placing fill over a pipeline is not necessarily substantial interference. Whether conduct constitutes substantial interference depends on the parties' intentions at the time that the easement was created. For example, if the parties contemplated that the servient estate owner would be permitted to make a particular use of the burdened land, such use does not constitute substantial interference even if it in fact limits the dominant owner's use of the easement. *See Chevron Pipe Line Co. v. De Roest*, 122 Or App 440, 446, 858 P2d 164 (1993), *adh'd to as modified on recons*, 126 Or App 113, 868 P2d 1, *rev den*, 319 Or 80 (1994) (rock piled on a pipeline easement by the servient owner did not unreasonably interfere with the easement even though it made access to the pipeline more difficult; evidence showed that the parties had contemplated that the servient owner would be permitted to make even more intensive uses of the land).

██ ██ The question, then, is what use the parties contemplated that defendant could make of the property within the easement boundaries. Ordinarily, the intentions of the parties to an express easement are reflected in the instrument creating the easement. However, Mountain Energy's easement was created by implication; thus, there is no such instrument from which we can determine the parties' intentions. Mountain Energy nevertheless bears the burden of producing evidence showing the extent to which the parties contemplated limits on defendant's rights. *See Cheney v. Mueller*, 259 Or 108, 118, 485 P2d 1218 (1971) (the party attempting to establish the existence of an easement by implication bears the burden of proof); *Dressler et al v. Issacs et al*, 217 Or 586, 597, 343 P2d 714 (1959) ("Irrespective of the character of the proof which the person asserting an implied easement must adduce, it is universally agreed that he has the burden of proof.").

---

[6] Defendant does not challenge the trial court's ruling that Mountain Energy has a pipeline easement by implication.

Mountain Energy argues that the circumstances that existed when it sold the property to defendant limit the use to which defendant can put the burdened property. That argument somewhat overstates the case. "In the absence of a contrary intent, the uses of both the dominant and servient owners are subject to adjustment consistent with the normal development of their respective lands." *Tipperman v. Tsiatsos*, 140 Or App 282, 291, 915 P2d 446 (1996), *modified in part on other grounds*, 327 Or 539, 964 P2d 1015 (1998). Here, there is no evidence that defendant bargained away the right to change the existing use of the burdened property at the time she acquired it. Accordingly, defendant's use of her property is limited only by the principle that she may not unreasonably interfere with Mountain Energy's use of and access to its pipeline. We turn to the evidence on that point.

Mountain Energy asserts that burying the pipeline to a depth of no more than four feet is reasonably necessary to its ability to maintain access to the pipeline, because having to excavate to a significantly greater depth is economically infeasible. Goldwasser testified that defendant placed as much as 12 feet of fill over a 545-foot section of the pipeline and that excavation of that section would cost $50,000 or more. However, that testimony was less convincing to the trial court than Galli's testimony that (1) defendant buried no more than 180 or 190 feet of the pipeline; (2) the added fill averaged only six feet in depth; and (3) any necessary excavation would cost between $3,000 and $3,500.

Ordinarily, we defer to a trial court's credibility findings that are based on that court's superior opportunity to observe the demeanor of the witnesses. *State ex rel SOSCF v. Metz*, 175 Or App 15, 18, 27 P3d 156 (2001). No deference is owed, though, where the trial court makes credibility findings based on the logical persuasiveness of the evidence. *State ex rel Juv. Dept. v. Smith*, 185 Or App 197, 222, 58 P3d 823 (2002). That is the circumstance here. Accordingly, we review the evidence in some detail.

The trial court found that Goldwasser's calculations and estimates were imprecise and speculative. Mountain Energy argues that Galli's estimates were no more precise because Galli merely "eyeballed" the area without actually

taking any measurements. Although that is true, Galli's estimates are supported by other evidence in the record. The survey map that plaintiffs introduced into evidence shows that, at most, approximately 100 feet of the pipeline actually lies beneath the road. At trial, Galli marked the map, without contradiction, to show where the fill extends beyond the road itself. Although the markings are not precise, they indicate that, if anything, Galli's estimate of 180 or 190 feet overstated the actual length of the affected section of the pipeline. Goldwasser's testimony that defendant covered 545 feet of the pipeline with fill, on the other hand, simply cannot be squared with the survey map. We therefore agree with the trial court's assessment that Galli's testimony was the more credible.

Because we find credible Galli's testimony as to the amount of fill that was added, we also accept his testimony that it would cost no more than $3,500 to excavate the portion of the pipeline that defendant covered with fill. Furthermore, there is no indication in the record that Mountain Energy would need to excavate that entire section with any frequency. To the contrary, based on Goldwasser's testimony, it is reasonable to infer that the need for excavation is unusual. We conclude that, under the circumstances, a cost of $3,000 to $3,500 would not unreasonably interfere with Mountain Energy's ability to obtain access to the pipeline. It follows that the trial court did not err in rejecting Mountain Energy's claim for interference with its pipeline easement.[7]

In their third assignment of error, plaintiffs assert that the trial court erred in failing to identify plaintiffs as the prevailing parties on defendant's counterclaim and, thus, in failing to award plaintiffs attorney fees on that claim. Plaintiffs also contend that the trial court made an excessive attorney fee award to defendant on plaintiffs' roadway easement claim by failing to exclude time defendant's attorney spent on claims for which defendant was not entitled to recover attorney fees. Defendant challenges both arguments; in particular, with respect to plaintiffs' first argument, defendant

---

[7] Because we conclude that defendant did not interfere with Mountain Energy's easement rights, we need not address the parties' arguments concerning mitigation.

asserts that plaintiffs waived their right to recover attorney fees by failing to make a formal request for attorney fees under ORCP 68.

We begin with plaintiffs' argument that the trial court failed to identify them as the prevailing parties on defendant's counterclaim. The judgment that the trial court entered included findings of fact and conclusions of law that defendant's counsel prepared and submitted. The conclusions of law in an initial draft of the judgment would have disposed of defendant's counterclaim as follows:

> "6. Defendant's counterclaim is denied, as the court concludes the work performed by defendant primarily benefitted her property and was beyond what would have been required to simply maintain the easement."

Plaintiffs objected to that provision, arguing that

> "[t]he court should supplement this paragraph, designating Plaintiffs as prevailing parties. Plaintiffs are entitled to attorney's fees since Defendant attempted to enforce terms and provisions of the easement agreement. *See Wilkes v. Zurlinden*, 328 Or 626, 633[, 984 P2d 261] (1999)."[8]

At a hearing on plaintiffs' objections, the trial court stated, "The counterclaim was a small part of this case and I think if you look at the lawsuit in its totality, the defendant is the prevailing party." Plaintiffs' counsel remonstrated that plaintiffs had prevailed on defendant's counterclaim and asked the court whether plaintiffs were entitled to attorney fees for prevailing on that claim. The court responded, "I think that [the counterclaim] was a minor part of this case, and I think if the Court's going to award attorney fees * * * there might be some consideration given in * * * what the amount of attorney fees might be." The court reiterated its belief that "the prevailing party in this case was the defendant, if you look at the lawsuit as a whole."

Despite those comments, the trial court ultimately entered a judgment that concluded:

---

[8] In *Wilkes*, the Supreme Court held that, when opposing parties successfully defend against each other's claims, each is a prevailing party entitled to an award of attorney fees on claims for which attorney fees are authorized. 328 Or at 633.

"6. Defendant's counterclaim is denied, as the court concludes the work performed by defendant primarily benefitted her property and was beyond what would have been required to simply maintain the easement. Plaintiffs are the prevailing parties under said claim only.

"7. The easement agreement was not breached or violated by defendant and she is the prevailing party under said agreement. * * * Defendant is entitled to attorney fees against Naomi D'Abbracci, Randal Cranor, Russell Hanson, Ernest and Louelle Bieri, and Donald Young under said agreement, jointly and severally, to be applied for pursuant to ORCP 68 after entry of these findings and judgment * * *."

After the trial court entered judgment, defendant submitted a request for attorney fees in the amount of $17,081.81; plaintiffs objected on several grounds. However, plaintiffs did not file a timely request for attorney fees under ORCP 68 for having prevailed on defendant's counterclaim. Instead, at the hearing on their objections to defendant's request for attorney fees, plaintiffs again argued that, having successfully defended against the counterclaim, they were entitled to attorney fees under *Wilkes*. At the conclusion of a hearing on plaintiffs' objections, the court stated that it would "look at the *Wilkes* case" before rendering its decision on plaintiffs' objections. Ultimately, the court issued a letter opinion in which it awarded defendant $15,000 in attorney fees. In the letter, the court stated that *Wilkes*

"would suggest both parties in some sense are prevailing parties. However, the Court would find that when considering an award of attorney fees, Defendant prevailed on all the major, important issues at trial. The award of attorney fees should however reflect, to the degree necessary, the prevailing status of the parties on the various claims together with their relative importance in the case and the result actually achieved. Finally, it should be noted Plaintiffs have never formally submitted a request for attorney fees.

"Utilizing this standard and taking into consideration Plaintiffs' other general and specific objections, the Court awards Defendant $15,000.00 in attorney fees * * *."

 According to plaintiffs, the trial court's decision failed to properly recognize their prevailing party status on the counterclaim, and they argue that the court's failure to identify them as a prevailing party foreclosed their need to file a request for attorney fees under ORCP 68 C. We disagree. This is not a situation in which the trial court categorically refused to award plaintiffs attorney fees. *Cf. Wiper v. Fawkes*, 198 Or App 331, 339, 109 P3d 798 (2005) ("[B]ecause the trial court refused to award attorney fees, defendants were not required to serve and file a detailed statement of attorney fees in order to preserve their objection to the denial of such an award."). Instead, before entering a general judgment, the court merely expressed doubt as to plaintiffs' entitlement to fees. When the court entered judgment, it nevertheless designated plaintiffs as the prevailing parties on the counterclaim. Despite that designation, plaintiffs failed to file the "signed and detailed statement of the amount of attorney fees" required by ORCP 68 C(4). "A trial court does not err by failing to award attorney fees when the party seeking them does not comply with ORCP 68 C(4)." *Lee v. Koehler*, 200 Or App 85, 93, 112 P3d 477 (2005) (citing *Bond v. Pereira-Giron*, 175 Or App 496, 501, 29 P3d 623 (2001), *rev den*, 333 Or 400 (2002)).[9]

 Finally, we turn to plaintiffs' apportionment argument. In that regard, plaintiffs objected before the trial court that defendant had included charges for time spent on matters not related to the roadway easement claim. Plaintiffs complained that, to account for time spent at trial addressing defendant's counterclaim and plaintiffs' claims that did not arise from the easement agreement, defendant's counsel had reduced his charges for trial time by only 20 percent; plaintiffs contended that at least 50 percent of the trial was devoted to those issues.

In making its decision, the trial court intertwined the issues of apportionment and offset of attorney fees among the parties' various claims. The court stated that its award to

_____

[9] Plaintiffs also argue that the trial court did not comply with ORS 20.077, which sets out the procedure for determining and awarding attorney fees in cases involving multiple claims in which more than one party prevails. However, plaintiffs did not call the trial court's attention to that statute and, accordingly, did not preserve their argument for the purpose of the present appeal.

defendant reflected "the prevailing status of the parties on the various claims" and that, in making its award, the court took into consideration plaintiffs' "general and specific objections." The court opined that the parties devoted most of their efforts at trial to the roadway easement claim, less time to Mountain Energy's claims, and "[v]ery little time" to defendant's counterclaim. However, the court did not state whether defense counsel's proffered 20 percent reduction reflected an adequate apportionment or whether the court adjusted that percentage in making the award. Furthermore, although the court "t[ook] into consideration" plaintiffs' other "general and specific objections," it did not state whether it actually agreed with any of them.

 Although courts have broad discretion in setting the amount of attorney fees, they nonetheless must make findings that are sufficient to permit meaningful appellate review of their awards. *See McCarthy v. Oregon Freeze Dry, Inc.*, 327 Or 84, 96, 957 P2d 1200, *adh'd to as clarified on recons*, 327 Or 185, 957 P2d 1207 (1998). The findings need not be extensive, but the court must describe the effect of each of the factors on which it relies in setting fees. *See id.* at 188 n 1; *Schoch v. Luepold & Stevens*, 162 Or App 242, 248-50, 987 P2d 13 (1999).

Here, it is unclear whether and to what extent the trial court ruled in plaintiffs' favor with respect to their apportionment objections and, consequently, whether any of the adjustment that the court made was attributable to an apportionment of defendant's fees among the parties' claims. For that reason, we are unable to meaningfully review the award to determine whether the court erred in apportioning defendant's attorney fees on the roadway easement claim. It follows that we must remand to the trial court for a more explicit explanation of its resolution of plaintiffs' apportionment objections.

Judgment for attorney fees vacated and remanded; otherwise affirmed.